UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS ISLEY, on behalf of himself and all others similarly situated,<br><br>      Plaintiff,<br><br> v.<br><br>BMW OF NORTH AMERICA, LLC and BAVARIAN MOTOR WORKS AG,<br><br>      Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

The allegations herein are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to all other matters based on an investigation by counsel.

**INTRODUCTION**

1.  This is a putative class action against BMW of North America, LLC ("BMW NA") and Bavarian Motor Works AG ("BMW AG") (collectively "BMW") on behalf of individuals who purchased or leased a 2012-present BMW automobile equipped with any variant of the N63TU engine, including certain model years of the BMW 5 Series, 6 Series, 7 Series, X5, and X6 (the "Class Vehicles").[1]

2.  BMW cars containing the N63TU engines and its subsequent variants are defective and were deceptively marketed and sold to consumers. As described in greater detail

---

[1] Upon information and belief, the Class Vehicles include the rear-wheel drive and all-wheel drive variants of the following BMW models: 2013-2019 750i/750Li, 2013-2018 650i, 2013-2019 650i Gran Coupe, 2013-2016 550i GT, 2014-2016 550i, 2017-2019 M550i, 2018-2019 M850i, 2014-2019 X5, 2014-2019 X6, and 2018-2019 X7.

below, BMW cars equipped with BMW's turbocharged V8 engines have long suffered from a defect causing excessive oil consumption (the "Oil Consumption Defect"). BMW has known about this for many years, and in fact faced a prior class action concerning earlier model cars equipped with N63 engines, which is the predecessor of the N63TU. BMW never fixed the defect, which continues to plague the Class Vehicles at issue in this action.

3.      As a direct result of BMW's wrongful conduct, owners of the Class Vehicles have suffered damages, including, *inter alia*: (1) out-of-pocket expenses for increased oil purchases, increased service visits, engine repair and/or engine replacement that would not be necessary but for the Oil Consumption Defect; (2) costs for future repairs or replacements; (3) sale of their vehicle at a loss; and/or (4) diminished value of their vehicles.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

5.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 Class members, members of the Classes (as defined below) are citizens of states different from Defendants, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendants are citizens.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant BMW NA, resides in and is headquartered in this district, regularly transacts substantial business in this district, is subject to personal jurisdiction in this district, and

therefore is deemed to be a citizen of this district.  Venue is also proper in this judicial district

as to Defendant BMW AG because, as a non-resident of the United States, BMW AG "may be

sued in any judicial district."  Additionally, Defendants have advertised in this district and have

received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this

district; therefore, a substantial part of the events and/or omissions giving rise to the claims

occurred, in part, within this district.

7.     This Court has personal jurisdiction over Defendants because they have

conducted substantial business in this judicial district, and intentionally and purposefully placed

Class Vehicles into the stream of commerce within New Jersey and throughout the United

States.

## **PARTIES**

8.     Plaintiff Thomas Isley is a citizen of the State of Tennessee and resides in

Kingsport, TN.  In 2015, Mr. Isley purchased a 2015 BMW X5 xDrive50i equipped with an

N63TU engine from Rick Hill BMW in Kingsport, TN.  He purchased the vehicle for personal

use.  Unbeknownst to Mr. Isley at the time of purchase, his BMW contained the Oil

Consumption Defect.  In early 2018, BMW replaced the engine in Plaintiff's X5 because he had

to routinely add 6-8 quarts of engine oil in between oil changes (which Plaintiff paid for out of

pocket).  However, the engine replacement did not resolve the Oil Consumption Defect.  Even

after the engine replacement, Plaintiff's X5 continues to consume excessive oil and requires

additional engine oil in between oil changes.

9.     Plaintiff, individually and on behalf of the Class and Subclasses, complied with

any applicable pre-suit notice requirement by contacting counsel for BMW and demanding that

the company remedy his vehicle, as well as all other Class Vehicles.

10.     Defendant Bavarian Motor Works AG ("BMW AG"), is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany.  BMW AG is the parent corporation of BMW of North America, LLC.  BMW AG designs, develops, manufactures, and sells luxury automobiles under the BMW brand name.

11.     Defendant BMW of North America, LLC ("BMW NA") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  BMW NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany.  The company sells vehicles through hundreds of independently-owned dealerships across the United States.  At all relevant times, BMW NA was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of New Jersey and throughout the United States.

12.     BMW NA and BMW AG sell BMW vehicles through a network of dealerships that are agents of BMW NA and BMW AG.

13.     There exists, and at all times herein existed, a unity of ownership between BMW NA, BMW AG, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.  BMW AG communicates with BMW NA concerning virtually all aspects of the BMW products it distributes within the United States.  Generally, BMW AG is responsible for the design and manufacture of the Class Vehicles, and BMW NA is responsible for advertising, distribution, warranties and customer service.

14.     At all times relevant to this action, Defendants manufactured, distributed, sold,

leased, and warranted the Class Vehicles under the BMW brand name throughout the United States. Defendants and/or their agents also developed and disseminated the window stickers, owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, the BMW Maintenance Program, advertisements, and other promotional materials relating to the Class Vehicles.

15.     At all relevant times, each BMW-authorized dealership and service provider acted as an authorized agent, representative, servant, employee and/or alter ego of BMW NA and/or BMW AG while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information, and monitoring the performance of BMW vehicles in the United States, including substantial activities that occurred within this jurisdiction.

## NEW JERSEY LAW APPLIES

16.     New Jersey law applies to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state. New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair. The State of New Jersey has the most significant relationship to this litigation and its law should govern.

17.     BMW owns property and conducts substantial business in New Jersey. BMW's customer relations, technical training center, engineering, marketing, and warranty departments are all located in BMW NA's Woodcliff Lake campus. BMW's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to BMW or third-party websites. BMW's warranty and engineering departments are

both responsible for the decisions to conceal the Oil Consumption Defect from BMW's customers, and for instituting a policy to systematically delay, defer, and/or deny warranty coverage to those who experienced engine failure caused by the defect.  BMW also has a vehicle preparation center in Port Jersey, New Jersey, where BMW inspects and prepares its vehicles for distribution throughout the United States, including the Class Vehicles.

18.     The policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, BMW's headquarters in Woodcliff Lake, New Jersey.  As detailed below, BMW also came to know, or should have come to know, of the Oil Consumption Defect through the activities of BMW divisions and affiliated entities located within New Jersey.  BMW NA made decisions in New Jersey related to advertisements, marketing, sales, and warranties of BMW vehicles.

19.     Defendant BMW NA is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting BMW vehicles.

## TOLLING OF STATUTES OF LIMITATIONS

20.     Any applicable statute(s) of limitations have been tolled by BMW's knowing and active concealment and denial of the facts alleged herein.  Plaintiff and the members of the Class could not have reasonably discovered the true, latent nature of the engine defects until shortly before this class action litigation was commenced.

21.     Even after Plaintiff and Class Members contacted BMW and/or its authorized dealers for vehicle repairs concerning the Oil Consumption Defect, they were routinely told by BMW and/or through its dealers that the Class Vehicles were not defective.

22.     BMW was and remains under a continuing duty to disclose to Plaintiff and the members of the Class the true character, quality and nature of the Class Vehicles, *i.e.* that the

Class Vehicle engines are defective and will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles.  As a result of the active concealment by BMW, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### I.    The Predecessor N63 Engine And The Oil Consumption Defect

23.    In 2008, BMW introduced a new turbocharged V8 engine, commonly called the "N63."  The N63 was groundbreaking in its design in that it "was the first to market with a hot-vee configuration and other cutting-edge technology like direct injection working in conjunction with twin turbochargers.  … [T]he N63 offered a reduced footprint for improved packaging, largely thanks to the hot-vee layout with the exhaust manifold and turbochargers mounted between the cylinder banks, exactly the opposite of generations worth of previous designs, which conventionally had exhaust manifolds on the outside of the cylinder banks and a single intake manifold occupying the valley."[2]

24.    The hot-vee design was a key feature of the N63.  Most auto manufacturers locate turbochargers outside of this V configuration, away from components that can become damaged or impacted from the excessive heat of the turbochargers.  While BMW's configuration saved space under the hood, it caused excessive heat-soak to the N63 engine and surrounding components.  As a result, the N63 engines consumed excessive amounts of engine oil between regularly scheduled service visits, which lead to an increased need for engine repairs or replacements, – such as replacement of valve stem seals – especially compared to other, similar vehicles not containing N63 engines (the "Oil Consumption Defect").

---

[2] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

25.     While the symptoms of the Oil Consumption Defect can manifest immediately, they can also worsen over time (for instance, at around 75,000 miles), long after the New Vehicle Limited Warranty for the Class Vehicles expires.  This means that many class members will begin to experience the Oil Consumption Defect soon, if they have not already.

26.     One of the reasons that the Oil Consumption Defect worsens over time is that the high heat of the already oil-thirsty engine tends to damage valve stem seals, hoses and other parts, leading to oil leaks that exacerbate the problem.  As one technician explained: [3]

> I remember back in the day, probably around 2008, when this guy came in with an E53 X5 with an N62 engine complaining about smoke from the tail pipe. We had never seen this before, so we checked the car the first time and couldn't find anything wrong with it so we let the car go. The guy came back a week later, insisting that his car was smoking from the tail pipe, and told us to let it idle for 15 minutes. We did that, and sure enough, there was smoke coming from the tail pipes. After checking a lot of stuff like crankcase vent valves and valve covers we figured out that the valve stem seals were leaking. After that, we started seeing a lot of these engines smoking from the exhaust **at around 75,000 miles and up**. Some were not too bad, and some looked like mosquito trucks.
>
> **After so many years of seeing these seals leak, the new N63 engine came out. BMW never addressed the issue with the N62, but we figured that for the new N63 engine there would be a design change to improve this flaw. Well guess what, the N63 uses the same damn part number for the valve stem seals in both engines and now the N63 is smoking too**. When you have smoke from the tail pipe from worn valve stem seals, this means that you're burning the engine oil inside the combustion chamber. **All engines consume some oil, but these burn a LOT of oil when they are smoking, and you end up topping off the engine oil frequently. BMW now states that it's normal for these turbo engines to consume about a liter of oil every 750 miles**. In my opinion that's really high, but then again I'm not an engineer. I just haven't seen a properly running N63 burn that much oil. **It also doesn't help that the turbos sometimes start**

---

[3] https://bmwvirtuoso.blogspot.com/2015/06/bmw-n63-valve-stem-seals.html (last visited Apr. 29, 2019).

> **to leak and can also cause a lot of oil burning, or make the situation worse combined with the valve stem seals**. …

27.     As another technician observed:[4]

> **The BMW N63 is a thirsty motor, and this became apparent early on**. …  [T]he oil change interval was moved from the insane 15k miles, to 10k.  An extra liter was added to the capacity of the sump to make all the way to 10k without a top-up.  Additionally, because of how hot the top of the engine is, the plastic PCV system gets an extreme workout in the heat cycling category.  This causes hoses to crack and break, and seals to shrink, **causing oil leaks all over the place**.  Typically these manifest themselves as a faint waft of oil smoke coming out from under the hood, very luxurious.  Speaking of Luxurious, **the valve stem seals are another non-metal component on the top of the engine that are subjected to huge doses of turbo heat.  Eventually they will start to leak, causing your high end BMW to smoke** like a Dodge Monaco after a few too many years in the front yard. …

28.     Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines.  The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear.  Engine oil also has important cleaning functions and serves as an important medium for dissipating heat throughout the engine.  As a result, the Class Vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

29.     The Oil Consumption Defect impacts several components of the N63TU engines, either via combustion of excessive amounts of engine oil directly or by providing these components with inadequate lubrication, which causes these components to prematurely fail and be frequently replaced.

30.     The Oil Consumption Defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil and causes voluminous oil consumption that

---

[4] https://www.eeuroparts.com/blog/9654/bmw-n63-hot-vee-hot-garbage/ (last visited Apr. 30, 2019).

cannot be reasonably anticipated or predicted.  The Oil Consumption Defect is unreasonably

dangerous because it can cause engine failure while the Class Vehicles are in operation at any

time and under any driving conditions or speeds, thereby exposing the Class Vehicle drivers,

their passengers, and others who share the road with them to serious risk of accidents and

injury.

31.     BMW had a duty to disclose the Oil Consumption Defect and the associated

out-of-pocket repair costs to Class Members because the defect poses an unreasonable safety

hazard, and because BMW had exclusive knowledge or access to material facts about the Class

Vehicles that were not known or reasonably discoverable by the Class.  BMW, however, failed

to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or

lease.

32.     BMW also had a duty to disclose the Oil Consumption Defect and associated

out-of-pocket repair costs to Class Members because, as alleged more fully in sections below

addressing BMW's warranties, BMW made uniform, partial representations about the need for

regularly-scheduled oil refills, without disclosing the presence of the Oil Consumption Defect,

which requires frequent oil refills outside of regularly scheduled maintenance.  Worse, BMW's

policy was to tell consumers that it was "normal" for its cars to consume a lot of oil, but there is

nothing "normal" about the Oil Consumption Defect.  BMW also made a partial representation

by telling Class Vehicle owners that – under the BMW Maintenance Program – their oil costs

would be $0 for the first 4 years / 50,000 miles of their ownership.",""

33.     The Oil Consumption Defect is consequential to Class Members, burdening

them with out-of-pocket expenses that would not be necessary but for such defect and depriving

them of their original bargains.  First, due to the excessive engine oil consumption, owners must

frequently pay for and add additional engine oil in between oil changes, notwithstanding the

BMW Maintenance Program promises to "cover[] all factory-recommended maintenance, as

determined by the Condition Based Service (CBS) system"  Second, the Oil Consumption

Defect means that Class Vehicle owners must be concerned with obtaining BMW-approved

engine oil when needed.  If owners continue to drive without adding oil, their vehicles might

catastrophically fail and strand them or potentially cause a life-threatening accident.  This

discourages some owners from traveling long distances in their Class Vehicles unless they bring

extra supplies of oil with them.  Third, Class Vehicle owners are at risk of suffering a

catastrophic engine failure in the future – and out of warranty – due to the Oil Consumption

Defect.  Fourth, Class Vehicle owners will suffer significant loss when they sell the Class

Vehicles because the reputation of these vehicles has been impaired due to the Oil Consumption

Defect.

## II.  <u>The N63TU Engine And Its Variants Suffer From The Oil Consumption Defect</u>

34.     In 2012, BMW released the N63TU engine – an updated version of the original

N63.  "For 2012, some four years after initial versions were first fitted to production vehicles,

the first technological update for the N63 was put into manufacturing, destined for 2013 model

year BMWs.  The N63B44O1 or N63TU as it is referred [was] … [r]eleased midway through

various platform production cycles, this version of the N63 would primarily see use in LCI

variants of the aforementioned 5, 6, and 7 Series, along with the X5 and X6."[5]  The N63TU

was equipped in the following Class Vehicles:  2013-2015 750i/750Li, 2013-2016 550i GT,

2014-2016 550i, 2014-2018 X5, 2014-2019 X6, 2013-2019 650i.

---

[5] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

35.     The N63TU is merely an update or evolution of the original N63 that still features the unique hot-vee engine design.  While "BMW prefers to use phrases and terms that summarize the engines within new models like the M5 or M850i as entirely new or completely redesigned, … the truth of the matter is that the same underlying N63 engine architecture has been at work the entire time, albeit with incremental and evolutionary changes having been fitted as technology and time allowed."[6]  The N63TU "used several components off the venerable N55 turbo engine.  These include the fuel injectors (which utilized a different style design) and Valvetronic III variable lift intake cam system, which was omitted at the original launch."[7]  However, this was not enough to remedy the Oil Consumption Defect because the N63TU ""continues to be plagued by issues baked-in from the original design."

36.     In 2016, BMW once again updated the N63 and debuted the N63TU2 engine. "Things were updated once again in 2016, this time with twin-scroll turbochargers taking the place of the conventional units within the N63, along with moving the oil and coolant heat exchangers in between the cylinder banks.  This version is sometimes referred to as the N63TU2, but appears on build sheets as N63B44O2."[8]  The N63TU2 was equipped in the following Class Vehicles:  2016-2019 750i/750Li and the 2016-2019 M550i xDrive.[9]

37.     In 2018, BMW released the N63TU3, another updated N63.  "Summarized under the umbrella term N63TU3, the individual versions are referred to as the N63B44M3 and

---

[6] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

[7] https://www.eeuroparts.com/blog/9654/bmw-n63-hot-vee-hot-garbage/ (last visited Apr. 29, 2019).

[8] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

[9] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

N63B44T3.  Changes for both include improved thermal shielding on the crank case and cylinder heads[,] … along with a redesigned ignition system."[10]  "The T3 version, which [is] fitted to the [2018-2019] M850i [and the 2019 750i/750Li] takes those improvements but adds high-pressure 5,000 PSI fuel injection, enlarged twin-scroll turbochargers, a redeveloped intake manifold and an additional upstream radiator." [11]  The M3 version, by contrast, is fitted to the 2018-2019 X5 and the 2018-2019 X7.[12]

38.     Despite design changes, the N63TU and its variants still suffer from the Oil Consumption Defect that plagued the original N63 and has been a persistent problem since the N63TU engine was first introduced in mid-2012.

39.     The N63TU and its variants were equipped in the Class Vehicles as follows:

| Year | Model | N63 Variant | Body Code | Warranties Start Expiring |
|------|-------|-------------|-----------|---------------------------|
| 2013-2016 | 550i GT | N63TU | F07 | 2017 |
| 2014-2016 | 550i | N63TU | F10/F11 | 2018 |
| 2017-2019 | M550i | N63TU2 | G30 | 2021 |
| 2013-2018 | 650i | N63TU | F12/F13 | 2017 |
| 2013-2019 | 650i Gran Coupe | N63TU | F06 | 2017 |
| 2013-2015 | 750i/750Li | N63TU | F01/F02 | 2017 |
| 2016-2019 | 750i/750Li | N63TU2 | G12 | 2020 |
| 2019 | 750i/750Li | N63TUT3 | G12 | 2023 |
| 2018-2019 | M850i | N63TUT3 | G15 | 2022 |
| 2014-2018 | X5 | N63TU | F15 | 2018 |
| 2018-2019 | X5 | N63TUM3 | G05 | 2022 |
| 2014-2019 | X6 | N63TU | X6 | 2018 |
| 2018-2019 | X7 | N63TUM3 | G07 | 2022 |

---

[10] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

[11] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

[12] https://bimmerlife.com/2018/08/23/n63-s63-differences-and-evolution/ (last visited Apr. 8, 2019).

III.     **BMW's Knowledge Of The Oil Consumption Defect**

A.     **The Oil Consumption Defect Has Been A Persistent Problem Since Defendants First Introduced The N63 Engine**

40.     Defendants have known about the Oil Consumption Defect since at least 2008 through sources not available to Class Members, including but not limited to pre-release testing data, durability testing, early consumer complaints about the Oil Consumption Defect to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, and other internal sources.  Defendants knew that the later N63TU engines suffered from the Oil Consumption Defect from these same sources, and also because (as alleged above), the N63TU engine had the same "underlying engine architecture" as the original N63, and the defect was "baked-in from the original design."  Put another way, BMW did not change anything when designing and manufacturing the N63TU that would fix the Oil Consumption Defect in the original N63.

41.     Knowledge also is imputed to BMW AG because BMW NA monitored warranty claims and Class Vehicle performance in the United States and reported back to its affiliated and parent company located in Germany.  In addition, the parent company monitored claims and performance of the Class Vehicles sold in other countries.

42.     In 2015, Consumer Reports published a study on excessive oil consumption, which examined nearly 500,000 vehicles across several makes and models.  The N63-equipped BMW 5 Series was the worst performer; the N63-equipped BMW 7 Series was the second worst; and the N63-equipped BMW 6 Series was the third worst.[13]  The Consumer Reports study also showed that 43 percent of 2011 BMW 5 Series cars equipped with the N63 engine

---

[13] https://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm

required additional engine oil to be added between BMW's recommended oil change intervals. In comparison, only 2 percent of all surveyed 2011 vehicles reported needing an extra quart of engine oil added between oil changes.  As a matter of common sense, Defendants would have learned about this study in 2015 because it was published by a widely-known and widely-respected organization.

43.     Online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products.  "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[14]  Many purchasers of vehicles containing the original N63 engine complained about the excessive engine oil consumption and need for frequent top-ups. Consumers posted numerous complaints on BMW-enthusiast websites and owner message boards about BMW cars equipped with the original N63 engine, and (as alleged more fully below) consumers continued to post similar complaints later about cars equipped with the N63TU.  They also filed numerous complaints with the National Highway Traffic Safety Administration ("NHTSA") about excessive oil consumption.  BMW regularly monitored these sources in connection with its ORM activities and therefore would have seen complaints about the Oil Consumption Defect by 2012, at the latest.

44.     BMW also knew about the Oil Consumption Defect from similar complaints about the original N63 and later N63TU made directly to the BMW NA's Customer Relations

---

[14] https://en.wikipedia.org/wiki/Reputation_management#Online_reputation_management.

and Services Department.  Plaintiff's warranty includes the following instructions if a service

center fails to address a customer's complaint:

> Despite the best intentions of all parties, a misunderstanding may occur between you and your authorized BMW SAV center. Should this occur and you require further assistance, please contact the BMW NA Customer Relations and Services Department at:
>
> Telephone: 1 800 831-1117
>
> Email: customerrelations@bmwusa.com
>
> Website: www.bmwusa.com

This means that BMW had a direct, real-time source of product feedback that was

entirely independent of its service representatives.

45.     BMW also knew about the Oil Consumption Defect because the defect

prompted a class action lawsuit covering vehicles equipped with the original N63 engine.  On

September 19, 2015, in *Bang v. BMW N. Am. LLC et al.*, D.N.J. Case No. 2:15-cv-06945,

several owners of N63-equipped cars filed a class action lawsuit seeking compensation for the

Oil Consumption Defect.  That case settled, and Judge Arleo of this District granted final

approval on September 11, 2018.  Among other relief, BMW agreed to reimburse class

members for certain out-of-pocket costs related to the Oil Consumption Defect, provide credits

for future oil services, and in some instances provide a replacement engine.  After the *Bang*

case was filed, however, BMW did nothing to correct the Oil Consumption Defect in other

cars equipped with the later N63TU engines, or any efforts BMW took were ineffective.

**B.     Defendants' Technical Service Bulletins And 2014 Customer Care Package**

46.     Since 2013, BMW has released one Technical Service Bulletin ("TSB") after

another directed at the Oil Consumption Defect.  These TSB's demonstrate BMW's long-

standing knowledge of the defect, its inability to fix the defect, and its efforts to falsely portray

the excessive oil consumption as "normal."

47.     In May 2013, BMW released TSB SI B11 01 13, which applied to both the original N63 engine and later N63TU engines.  In that TSB, BMW acknowledges that consumers were complaining that the engine oil consumption is "too high," and instructed service technicians to respond to such complaints by adding two quarts of engine oil, even though the driver display in the vehicles tells owners to add only *one* quart.  That TSB stated as follows:

> Subject: N63 and N63T Engine: Engine Oil Consumption, Engine Oil Top-ups and Refill Capacity
> MODEL
> F01 F02 F06 F07 F10 F12 F13 E70 E71
>
> **Customers with one of the vehicles above may complain that the engine's oil consumption is "too high," resulting in engine oil top-ups and workshop visits to address the issue before the vehicle displays an engine oil service as being "due."** When the vehicle's engine oil drops to the minimum level, a message will display in the vehicle advising the driver to "add 1 quart of engine oil." After topping up and continued operation, the "add engine oil" message may display again before an engine oil service is required and performed.
>
> Cause:
> Engines that are fitted with a turbocharger, as part of their normal operation, will consume engine oil at a higher rate than a naturally aspirated engine (non-turbocharged engine). In this case, a "turbocharged" engine could require topping up of the engine oil more frequently.
>
> Procedure:
> Engine oil - Topping up
> **When one of the above vehicles displays a message to add 1 quart of engine oil, BMW recommends adding 2 quarts of engine oil instead.** The engine's oil sump design allows the additional quart; the result is a total capacity of 9.5 quarts (9.0 liters) of engine oil.
>
> Engine oil:
> Maintenance services and engine repairs

When performing all future engine oil maintenance services and repairs that require draining and refilling the engine oil, **the new recommended refill specification is 9.5 quarts (9.0 liters) of engine oil.**

48.     Simply put, instead of addressing the underlying cause of excessive oil consumption to fix that defect, BMW recommended that its service technicians add more engine oil to minimize top ups in response to consumer complaints.  While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in Class Vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

49.     In October 2018, BMW updated TSB SI B11 01 13 to cover additional Class Vehicles:

**UPDATE! MODEL**

| | | | |
|---|---|---|---|
| F01 and F02 (7 Series Sedan) | F07 (Gran Turismo) Produced from 7/2012 | F10 (5 Series Sedan) Produced from 7/2013 | F12 (6 Series Convertible) |
| F06 (6 Series Grand Coupe) | E70 (X5) | E71 (X6) | F13 (6 Series Coupe) |
| F15 (X5) | F16 (X6) | | |

50.     In August 2013, BMW issued TSB SI B11 03 13, which set forth a new "Oil Consumption Specification" stating that "[a]ll BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time:"

**OIL CONSUMPTION SPECIFICATION**
All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.

Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.

51.     In the August 2013 TSB, BMW again noted that turbocharged engines "**could require topping up of engine oil more frequently**" and that the "additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect."  Nonetheless, BMW used this TSB to also provide instructions for conducting

18

a "oil consumption test" in order to identify excessive oil consumption.

52.    BMW updated TSB SI B11 02 13 three years later, in August 2016.  When it did so, BMW also instructed dealers and technicians to provide the following brochure to the customer "when topping up the engine oil" in N63 and N63TU-equipped cars:



**BMW Engine Oil Consumption**

BMW high-performance turbocharged V engines (V8/V12) have large displacements and can consume larger quantities of engine oil compared to smaller engines within the BMW model line.  All engines normally consume a certain amount of engine oil. This is necessary to properly lubricate the cylinder walls, pistons, piston rings, valves, and turbocharger(s).  Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines).

The latest generation of BMW turbocharged engines represent the most advanced technology for decreasing fuel consumption by reducing internal engine friction (power losses).  These true-performance engines are designed for more aggressive power output, in addition to delivering respectable fuel economy.  Turbocharger longevity and engine durability require that some of the engine oil be circulated through the various internal engine components, including the turbochargers, which is representative of normal consumption in engine oil.  Oil consumption can be slightly higher during the engine "break-in" period, which varies depending upon individual driving profiles.

Your vehicle is equipped with an electronic oil level monitor which indicates when the engine oil needs to be replenished.  Should the oil level fall below optimal levels, please top up the engine oil with 2 (two) quarts of the proper viscosity engine oil.  An excellent choice is the Original BMW Engine Oil. (See the "Adding Engine Oil" section of your vehicle's Owner's Manual or visit an authorized BMW center for servicing.)

© 2016 BMW of North America, LLC. The BMW name, model names and logo are registered trademarks.

53.    As can be seen from the brochure shown above, BMW continued to

misrepresent to Class Members that the rate of oil consumption in the N63TU engines was "normal" and to be expected in engines that are fitted with turbochargers.  This level of engine oil consumption is not normal or expected.  Indeed, the subtitle of the above-referenced 2015 Consumer Reports study was: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.*

54.     In September 2013, BMW issued TSB SI B11 04 13, titled "N63TU Engine: Engine Oil Consumption" to address "customer complains that the 'low engine oil' message is displayed too frequently."[15]  The TSB identified potential causes of the oil consumption defect and affected models:

**MODEL**

| F01 (7 Series Sedan) | F02 (7 Series Sedan) | F06 (6 Series Gran Coupe) | F07 (5 Series Gran Turismo) |
|---|---|---|---|
| F12 (6 Series Convertible) | F13 (6 Series Coupe) | Produced from 6/2012 to 12/2012 | |

**SITUATION**
The customer complains that the "low engine oil" message is displayed too frequently.

**CAUSE**
The cause is related to, but not limited to, one or more of the following components and systems shown below:

- Turbocharger
- Crankcase ventilation
- Engine gasket leaks
- Internal engine tolerances and sealing
- Improper filling or topping up

Use the troubleshooting procedure below to help identify the cause.

This TSB also provided procedures for addressing this issue, including instructions on how to perform an oil consumption test.  BMW updated this TSB in November 2014 and June 2016.

55.     In February 2017, BMW issued TSB SI B11 01 17 titled "N63T AND S63T ENGINE: VALVE SEAL REPLACEMENT" in order to provide "a new procedure for the N63TU valve seals replacement."[16]  Per this TSB, valve seals should be replaced when there is

---

[15] https://static.nhtsa.gov/odi/tsbs/2013/SB-10053583-5021.pdf (last visited Apr. 30, 2019).

[16] https://static.nhtsa.gov/odi/tsbs/2017/MC-10146525-9999.pdf (last visited Apr. 29, 2019).

"[e]xcessive engine oil consumption."  This TSB reveals that the N63TU - like the N63 - is

susceptible to excessive oil consumption due to leaking valve seals.  BMW updated this TSB in

May and November 2017 to include additional models:

**MODEL**

| F01 and F02 (7 Series Sedan)vProduced from 7/2012 | F06 (6 Series Grand Coupe) Produced from 7/2012 | F07 (Gran Turismo) Produced from 7/2012 | F10 (5 Series Sedan) Produced from 7/2013 |
|---|---|---|---|
| F12 (6 Series Convertible) Produced from 7/2012 | F13 (6 Series Coupe) Produced from 7/2012 | F15 (X5) Produced from 6/2013 | F16 (X6) Produced from 6/2014 |
| F85 (X5M) Produced from 3/2014 | F86 (X6M) Produced from 3/2014 | F06 (M6 Grand Coupe) Produced from 7/2014 | F10 (M5) Produced from 7/2012 |
| F12 (M6 Convertible) Produced from 7/2012 | F13 (M6 Coupe) Produced from 7/2012 | | |

UPDATE! **SITUATION**

This SI provides a new tool and a new procedure for the N63TU valve seals replacement.

Please refer to the following applicable Service Bulletins before replacing the valve seals.

- SI B11 07 11 - Turbocharger Failure: Oil Supply and Return Line Blockage and Proper Repairs
- SI B11 01 13 - N63 and N63TU Engines: Engine Oil Consumption, Engine Oil Top-ups and Refill Capacity
- SI B11 03 13 - Engine Oil Consumption (all models)
- SI B11 04 13 - N63TU Engine: Engine Oil Consumption

If the valve seals are leaking, one of the following will help determine if the seals should be replaced.

- Smoke from the tailpipe when starting or aggressively accelerating and decelerating the engine in addition to excessive engine oil consumption
- Spark plugs fouled with engine oil and excessive engine oil consumption
- Excessive engine oil consumption

**All Vehicles:**

UPDATE! On vehicles, **where an excessive oil consumption between services is the only complaint**, a complete oil consumption test as described in SI B11 03 13, must be performed first before replacing the valve seals.

UPDATE! On vehicles exhibiting **reproducible smoking from the tailpipe when hot**, additional engine diagnostic steps (e.g. engine compression test, leak-down tests; inspection of the crankcase ventilation lines and turbo intake/outlet tubes for excessive oil accumulation) should be performed and documented prior to replacement of the valve seals, in order to eliminate other possible causes. Refer to the SIBs listed above for important diagnostic tips.

**Do not remove the intake manifolds to clean the intake valve carbon.**

56.    In August 2017, BMW issued TSB SI B11 11 17 titled "ENGINE LEAK

DIAGNOSIS ON TURBOCHARGED V8 ENGINES."  BMW issued an updated version in

September 2018 applicable to vehicles equipped with an N63TU or its variants.[17]  Given the

complexity of these engines, BMW instructs its technicians that "it is necessary to use a

---

[17] https://static.nhtsa.gov/odi/tsbs/2018/MC-10149961-9999.pdf (last visited Apr. 30, 2019).

borescope to identify if the source of the leak is from under the turbochargers.  Engine oil or

coolant leaking from the bell housing area or the front timing chain cover area may be caused

by the turbocharger itself, a turbocharger oil/coolant feed line or turbocharger oil/coolant return

line."  As this TSB confirms, all variants of the N63TU are susceptible to the Oil Consumption

Defect and require an internal engine inspection to diagnosis the source. [18]  In April 2018,

BMW released TSB SI B11 03 18 titled "N63R ENGINE: ENGINE OIL LEAK DIAGNOSIS

AT TURBOCHARGER" to diagnose the source of oil leaks in additional models equipped with

variants of the N63TU:

### N63R ENGINE: ENGINE OIL LEAK DIAGNOSIS AT TURBOCHARGER

#### MODEL

| G12 (750Li Sedan) Produced from 5/2015 | G12 (ALPINA B7 Sedan) Produced from 12/2015 | G30 (M550iX Sedan) Produced from 12/2016 |
|---|---|---|

With the N63R engine

#### SITUATION
An engine oil leak is found on the ground under the vehicle when parked.

The turbocharger engine oil supply (feed) lines are leaking engine oil into the center of the engine.

The engine oil will then exit between the engine and transmission before reaching the ground.

#### DIAGNOSIS
Use these diagnostic steps to determine the location of the engine oil leak.

57.    In addition to the various TSB's described above, BMW also responded to

customer complaints about the Oil Consumption Defect with a so-called "Customer Care

Package" issued in late 2014.  The Customer Care Package consisted of several different

measures, which merely mask, but did not correct, the serious design and/or manufacturing

defects of the N63 engine including the Oil Consumption Defect:

- •    BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000-mile service interval. The Customer Care Package significantly reduced the

---

[18] https://static.nhtsa.gov/odi/tsbs/2018/MC-10149961-9999.pdf (last visited Apr. 29, 2019).

mileage of its recommended engine oil change intervals for all Class Vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

•       BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

•       BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

58.     Despite offering a Customer Care Package for N63-equipped cars, BMW has not extended this program to the vehicles at issue here – BMWs equipped with the N63TU engine or any of its variants, even though the latter also suffer from the Oil Consumption Defect.

## C.     Customer Complaints Online And To NHTSA

59.     As alleged above, BMW owners have complained on the internet for years about the Oil Consumption Defect.  Internet forums for BMW owners and enthusiasts are replete with complaints about the Oil Consumption Defect occurring in later model years equipped with N63TU engines.  For example, complaints can be found on Bimmerfest.com, which is part of the AutoGuide.com network of professionally managed automotive enthusiast internet forums. BMW monitors the website in connection with its online reputation management activities because the website is popular among U.S. BMW owners.  As a result, BMW would have seen complaints and concerns about the Oil Consumption Defect in 2013 and later model year cars equipped with the N63TU engine.  These posts also show that BMW is continuing to downplay the problem, just as it did with the earlier model year cars at issue in the earlier *Bang* litigation. These complaints also show that (1) consumers are upset about the Oil Consumption Defect, (2) BMW tells consumers to purchase needed oil at their own cost, and (3) the defect can manifest even in cars with low mileage.  The following are some of complaints and concerns posted on Bimmerfest.com:

- "I purchased a BMW X5 in 2015 and began to observe excessive oil consumption by February 2016. It consumed 1 quart every 800Km to 900Km. The local BMW agent is aware of the situation as they have been logging all the top-ups. This seems to be a major mechanical defect, but I am being advised to continue with the topping up or change the engine at my cost. This has already caused major inconvenience and reduces the value of my investment in this high-end vehicle. I am very disappointed with this situation and cannot believe that this would be BMW's policy."

- "Hi, on a recent weekend trip my 2016 50i went from warning oil low to oil below low refill now with two quarts, at just 4300 miles!  I did some searching and it seems this is a common issue, several older threads, a consumer reports study, BMW stating a quart per 900 miles, and there is a class action lawsuit against BMW, and other manufacturers.  I've never ever owned a car that used this much oil!  The nearest dealer I found on the way refilled without blinking, did not even ask my name or details.

- "My experience with a 2017... Going down the interstate with the cruise set at 83MPH on the start of a 500 mile road trip and "DING" goes the oil meter. Only yellow, then 75 miles later "DING" again and now it is critical and red. Had to stop and I hate stopping except for fuel. Love the car but god dam at +$85K and 6 months old I should not need to exit and buy two quarts of oil."

- "BMW will tell you it's normal. Anyone who knows about engines will tell you they're just covering for a known problem they can't seem to solve. Sniff around Bimmerpost and you'll see others with the same problem."

61.     As another user detailed:

I took my car in for service at the beginning of this week. **I told them about the usual oil consumption issue, and this would have been 800 miles since the last oil change. The oil level had gone down by 1/4 notch which is about a quart.** The EPS (ticking noise from the steering wheel front of car) had came back from a year ago when it was replaced and fixed. A few days later, he informed me that they will replace the engine. It currently has 24K on it.

I mentioned to him about the valve steam seal issue, the crankshaft ventilation seal, and among a few other things.  He said, we will take care of the issue. Problems like this on this engine (n63tu), they do not replace valve stem seal. They replace the whole engine. I was speechless.[19]

62.     At least one person who posted on Bimmerpost.com apparently received candid

---

[19] https://www.bimmerfest.com/forums/showpost.php?p=9562921&postcount=1 (last visited Apr. 8, 2019).

information from a BMW representative: "The issue cannot be resolved according to BMW.

**They said if you replace every part the engine will still have this issue**. I can't believe that

BMW sells that engine—they know it doesn't work reliably."

63.     There also have been several complaints to NHTSA about the Oil Consumption

Defect. BMW monitors those complaints as part of its online reputation management and/or to

identify potential defects in its vehicles, knowing that it is often the case that for every person

who complains about a defect, there are many other people who experienced the same defect

but who do not complain to NHTSA.

64.     Between 2013 and 2015, there were several complaints posted on NHTSA's

website concerning the Oil Consumption Defect in cars with the original N63 engine.

Consumers complained of "hav[ing] to add oil every 500 miles," complained that BMW did

nothing about the problem, and that burning through so much oil so quickly "could leave the

vehicle stranded and inoperable"—even in "brand new vehicles."

65.     Consumers have made similar complaints to NHTSA about the later N63TU

engines at issue here:

> **Date Complaint Filed:**       5/31/2018
> **Date of Incident:**           5/01/2018
> **Component(s):**               ENGINE
> **NHTSA ID Number:**            11098956
> **Consumer Location:**          Phoenix, AZ.
> **Vehicle Identification No. (VIN):** 5UXKR6C550J******
> **Summary of Complaint:**    2010-2013 N63 V8 ENGINES HAD
> NUMEROUS ISSUES WITH VALVE SEALS, CCV HOSES, OIL LEAKS
> AND PREMATURE ENGINE FAILURE LEADING TO LAWSUITS AND
> RECALLS. BMW SAYS THEY IMPROVED THE PROBLEM WITH 2013+
> N63TU ENGINES, BUT AT 50,000 MILES, MINE ALSO HAD FAILING
> CCV HOSES AND OIL PAN LEAKS, AND POTENTIAL EXPENSIVE
> VALVE GUIDE SEAL FAILURE
>
> **Date Complaint Filed:**       9/25/2017

| | |
|---|---|
| **Date of Incident:** | 6/29/2015 |
| **Component(s):** | ENGINE |
| **NHTSA ID Number:** | 11025421 |
| **Consumer Location:** | PHILADELPHIA, PA. |

**Vehicle Identification No. (VIN):** WBSFV9C59DC******

**Summary of Complaint:** CAR READS LOW ON OIL WHILE DRIVING. I HAVE TAKEN IT BACK TO DEALER AND WAS TOLD THAT THE CAR ONLY NEEDED ONE QUART OF OIL. DEALER HAS NEVER LOOKED TO SEE IF THERE IS A PROBLEM WITH THE TOLERANCE BETWEEN THE ENGINE OIL PUMP DRIVE SHAFT AND THE PUMP'S ROTOR. DEALERSHIP ONLY SHOWED MY HUSBAND HOW TO REPLENISH OIL WHEN LIGHT COMES ON. THIS HAS PROBLEM BEGAN WHEN THE CAR ONLY HAD 29,000 MILES. THE LIGHT WILL COME ON WHEN CAR IS STATIONARY AND IN MOTION ON A CITY STREET OR HIGHWAY. CURRENTLY MUST DRIVE AROUND WITH A QUART OF OIL IN CAR AT ALL TIMES FOR SAFETY REASONS. CAR NOW HAS 40,000 MILES.

**IV.    BMW Foists The Costs Of Dealing With The Oil Consumption Defect On Customers With Its Misleading Maintenance Program**

66.    Every Class Vehicle sold came with "BMW Ultimate Service" and the "BMW Maintenance Program" for 4 years/50,000 miles:

**BMW Ultimate Service™**

BMW Ultimate Service leads the industry in providing owners with incredible value and peace of mind. This service includes:

▷ **The BMW Maintenance Program:** No cost factory-recommended maintenance for 4 years/50,000 miles from the original in-service date, whichever comes first, for the initial purchaser, owner, or lessee of this vehicle from an authorized BMW center. BMW Maintenance Program coverage is not transferable. See page 3 for details.

▷ **BMW Roadside Assistance:** No-cost 24/7 on-the-road assistance for 4 years/unlimited miles from the original in-service date. Also includes trip-interruption benefits as well as trip routing services.

▷ **New Vehicle Limited Warranty:** Limited coverage for defects in materials and workmanship for 4 years/50,000 miles from the original in-service date, whichever comes first. Repairs will only be made at authorized BMW SAV centers using Original BMW Parts.

67.     This was featured on the window stickers for the Class Vehicles and detailed in the accompanying Service and Warranty Information booklet:



68.     As this window sticker made clear, BMW expressly warranted that "Maintenance Costs" "[f]or the first 4 years or 50,000 miles" will be "$0" for "all factory-recommended services," including "Engine Oil Services."  Based on this, a reasonable consumer would expect to incur $0 in engine oil costs over the first 4 years or 50,000 miles of ownership.  This is confirmed by reference to the Service and Warranty Information booklet, which details that the BMW Maintenance Program "covers all factory-recommended maintenance, as determined by the Condition Based Service (CBS) system" and guarantees that any authorized BMW center will "perform the scheduled and/or additional maintenance services on your vehicle at no expense to you:"

**Coverage**

The BMW Maintenance Program covers all factory-recommended maintenance, as determined by the Condition Based Service (CBS) system. Additional specific items that need replacement due to normal wear and tear, and that are not covered by the original New SAV Limited Warranty - such as brake pads, brake rotors and wiper blade inserts - are included, provided wear and tear exceeds BMW specifications. Any applicable adjustments required due to normal operating conditions are also included. See pages 8 - 9 of this Booklet for additional information.

Any authorized BMW center in the United States (including Puerto Rico) will perform the scheduled and/or additional maintenance services on your vehicle at no expense to you so long as your vehicle qualifies for coverage under the BMW Maintenance Program.

69.     The Condition Based Service ("CBS") system in every Class Vehicle computes "the actual optimum maintenance requirements" for the vehicle.,,,

70.     The CBS system "thus determines the current and future maintenance requirements" for engine oil in the Class Vehicles:

## Condition Based Service (CBS)

CBS is a further development of the Service Interval Indicator System.

The remaining times for selected maintenance tasks as well as any legally prescribed dates are displayed to you individually:

▷ Engine oil
▷ Brakes - front and rear separately
▷ Brake fluid
▷ Vehicle check
▷ Required State Inspection(s)

CBS thus determines the current and future maintenance requirements. This data can also be read from the vehicle key by your BMW Service Advisor and used to propose the optimum scope of maintenance.

## Maintenance service summary

The Condition Based Service (CBS) system will determine the requirement for performing the maintenance services described in this section, ending on page 9. These services may be required either individually or in conjunction with other maintenance services.

Maintenance services are performed as outlined in this section, based on intervals of either time, mileage or after performing a specified number of previous services. These intervals correspond to the latest information available when this Booklet was printed. Maintenance intervals are subject to change with newer vehicles or may also apply retroactively. Your authorized BMW SAV center will be able to advise and perform maintenance services as required by the most recent information that applies to your vehicle.

The maintenance services "connected to a specific CBS engine oil service," are outlined below.

71.     Per BMW's Service and Warranty Information manual, the engine oil in the Class Vehicles must be changed at intervals determined by the CBS system:

## Intervals

Time intervals should be followed using the maintenance interval as indicated by the Condition Based Service (CBS) display.

72.     Class Vehicle owners only know additional oil is required between oil changes when they are prompted by their vehicles' CBS system and a notification appears on the dash.

The same CBS system provides a similar notification for required services:



**Service Required Display**

**Info Display screen contents**

X3 shown; X4, X5 and X6 are similar

73.     Due to the Oil Consumption Defect, the CBS system frequently instructs owners of the Class Vehicles to add multiple quarts of engine oil in between oil changes, sometimes as often as every 1,000 miles.  Accordingly, this instruction to add engine oil is a required, "factory-recommended maintenance, as determined by the [CBS] system" and thus within the coverage provided by the BMW Maintenance Program.

74.     BMW maintains that oil consumption is supposedly normal for these vehicles,[20] and on that basis "exclu[des]" "topping off" of engine oil from coverage under the BMW Maintenance Program.  BMW provides a list of permissible oils owners can use "if" they are instructed to top up their engine oil, expecting owners to pay for the oil themselves:

---

[20] According to BMW Service Information bulletin SI B11 03 13, "All engines consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and if equipped, the turbocharger(s).  …  Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged)."

▷ "Topping off" low fluids (e.g., engine oil, antifreeze, washer fluid, etc.) except when done in conjunction with a scheduled maintenance or other required maintenance work (as outlined in the customized maintenance checklist printout) that is performed during an applicable Maintenance Program period

If you need to add oil between oil changes and BMW High Performance Synthetic Oil is unavailable, for the purpose of topping up the engine oil level only, BMW recommends use of one of the below-listed synthetic oils:

For gasoline engines: The synthetic oils listed below meet BMW's Long-life rating LL01 (API rating SL):
▷ Castrol Syntec European Formula SAE 0W-30
▷ Mobil 1 SAE 0W-40
▷ Pennzoil Platinum European Formula Ultra SAE 5W-30
▷ Valvoline SynPower SAE 5W-30

75.     However, because of the Oil Consumption Defect, it is not a question of "if/when" the Class Vehicles will need additional oil, but rather one of "how much" additional oil will they need and "how often" will they need it.  BMW's refusal to cover "top ups" of engine oil in between oil changes is significant because – unbeknownst to consumers – the Oil Consumption Defect causes the Class Vehicles to require frequent "top ups" in between oil changes.  The CBS system, Maintenance Program, and exclusion for "top ups," combined, therefore furnish another example of a partial representation giving BMW a duty to disclose the Oil Consumption Defect.

76.     As a result of the Oil Consumption Defect, Class Vehicle owners have been forced to routinely add multiple quarts of expensive engine oil between scheduled maintenance at their own expense or risk losing their warranty coverage:

> Failure to maintain the vehicle properly in accordance with the instructions in the Owner's Manual or the Service section of this Statement, that results in the failure of any part of the vehicle.

## V.     BMW's New Vehicle Limited Warranty

77.     The Class Vehicles were sold with a standard BMW New Vehicle Limited Warranty, which the company refers to as its "New SAV Limited Warranty."  Upon information and belief, the New SAV Limited Warranty is materially identical to the BMW warranties on all other N63TU-equipped vehicles.  Collectively, these practically identical

warranties will be referred to as BMW's "New Vehicle Limited Warranty."

78.     The New Vehicle Limited Warranty includes the following terms:

**Warrantor**

BMW of North America, LLC (BMW NA) warrants during the Warranty Period the 2015 U.S.-specification BMW vehicles distributed by BMW NA or sold through the BMWNA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser.

**Warranty Begins**

Coverage begins on the date of first retail sale or the date the vehicle is first placed into service as a sales demonstrator, Aftersales Mobility Program (AMP) Vehicle or company vehicle, whichever is earlier.

**Warranty Period**

The warranty period is 48 months or 50,000 miles, whichever occurs first, except for as noted below.

**Warranty Coverage**

To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States (including Puerto Rico), during normal business hours.

The authorized BMW SAV center will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. The decision whether to repair or replace said part(s) is solely the prerogative of BMWNA. Parts for which replacements are made become the property of BMW NA. In all cases, a reasonable time must be allowed for warranty repairs to be completed after the vehicle is received by the authorized BMW SAV center.

79.     BMW also offers a Certified Pre-Owned Warranty on used BMW vehicles sold

from authorized BMW retailers. This warranty is largely identical to original warranty, with

certain additional exclusions, and provides coverage against defects and workmanship for 2

years/50,000 miles after the expiration of the New Vehicle Limited Warranty for a total

coverage period of 6 years/100,000 miles.

80.     The New Vehicle Limited Warranty does not protect Class Vehicle owners

from the Oil Consumption Defect because BMW's efforts temporarily mask these conditions

instead of providing purchasers with non-defective vehicles as originally warranted.

81.     BMW has attempted to mask the Oil Consumption Defect until the expiration

of the New Vehicle Limited Warranty by characterizing the excessive oil consumption as

"normal" and further instructing service representatives and owners to overfill the Class

Vehicles with engine oil. These measures fail to remedy the defect because Class Members are

still left with a defective engine that consumes excessive amounts of engine oil after the

expiration of the New Vehicle Limited Warranty.  As a result, Class Vehicle owners are forced

to pay for additional oil between service visits (despite the BMW Maintenance Program's

promise to the contrary), are forced to worry about their vehicles spontaneously needing oil

away from an authorized service center, ,and will be forced to sell or trade their vehicles for a

decreased value.

82.     Unbeknownst to Plaintiff and members of the putative classes at the time they

purchased or leased the Class Vehicles, Defendants designed and sold vehicles that were

defective in workmanship, material and manufacturing.  The location, housing and placement of

the turbochargers in the N63TU contribute to overheating and the Oil Consumption Defect, and

constitute a defect in design, materials and workmanship.  Defendants' failure to design,

assemble and manufacture the N63TU and its variants in such a way as to prevent the Oil

Consumption Defect also is a defect in materials and workmanship, as well as design.

83.     Defendants breached their express and implied warranties through which they

promised to, inter alia, (1) provide Class Vehicles fit for the ordinary purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including the Oil Consumption Defect.  Because the Oil Consumption Defect was present at the time of sale or lease of the Class Vehicles, Defendants are required to repair or replace the engine under the terms of the warranties.

84.    BMW's written warranties also were unconscionable.  BMW knew about the Oil Consumption Defect at the time of sale or lease, but Plaintiff and class members did not. As alleged above, the Oil Consumption Defect can worsen at around 75,000 miles, which is after the warranty period, but prior to the end of the Class Vehicles' useful lives.  Plaintiff and class members had no meaningful choice in determining the temporal and/or mileage limits of the warranties.  The warranties were drafted by BMW, without any input from consumers, and there was a gross disparity in bargaining power in favor of BMW.  As a result, the terms of the warranties unreasonably favored BMW.

85.    Defendants have caused Plaintiff and Class Members to expend money at their dealerships or other third-party repair facilities and/or take other remedial measures related to the Oil Consumption Defect in the Class Vehicles such as carrying additional quarts of engine oil with them at all times.

86.    Despite the promises set forth by BMW in the New Vehicle Limited Warranty and the BMW Maintenance Program, Defendants have not recalled the Class Vehicles to repair the Oil Consumption Defect, and have not offered to reimburse Class Vehicle owners and leaseholders who incurred costs relating to the Oil Consumption Defect.

87.    As a result of the Oil Consumption Defect, Plaintiff and the Class Members have not received the value for which they bargained when they purchased or leased the Class

Vehicles.  In addition, the value of the Class Vehicles has diminished, including, without

limitation, the resale value of the Class Vehicles.  BMW enthusiasts who are familiar with the

Oil Consumption Defect are reluctant to purchase BMW cars if they are equipped with N63TU

engines.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a)

and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class and Subclasses:

> All persons or entities in the United States who purchased, leased,
> or own a Class Vehicle (the "Nationwide Class" or "Class").

89.     In the alternative, pursuant to Federal Rules of Civil Procedure, Rule 23(c)(5),

Plaintiff seeks to represent the following state classes if the Court declines to certify the

Nationwide Class above:

> All persons or entities in the states of California, Florida, Illinois,
> Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New
> York, and Washington who purchased, leased, or own a Class
> Vehicle (the "Multi-State Consumer Fraud Class");[21]
>
> All persons or entities in New Jersey who purchased, leased, or
> own a Class Vehicle (the "New Jersey Subclass");
>
> All persons or entities in Tennessee who purchased, leased, or own
> a Class Vehicle (the "Tennessee Subclass");

90.     Subject to additional information obtained through further investigation and

discovery, the above-described Classes may be expanded or narrowed by an amended

---

[21] The states in the Multi-State Consumer Fraud Class are limited to those states with similar
consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et
seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*);
Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et
seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §407.010, *et seq.*);
New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); and
Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

complaint, or narrowed at class certification.

91.     Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

92.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are tens of thousands of individuals that are members of the proposed Classes.  Although the precise number of proposed members is unknown to Plaintiff, the true number of Class members is known by Defendants.  More specifically, BMW and its network of authorized dealers maintains databases that contain the following information: (i) the name of each Class member that leased or purchased a vehicle; and (ii) the address of each Class member.  Thus, Class members may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

93.     **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a)      Whether the Class Vehicles are defective because they frequently burn, leak, and/or otherwise consume excessive amounts of engine oil;

b)    Whether the Oil Consumption Defect constitutes an unreasonable safety risk;

c)    Whether the Class Vehicles are defective because they are unreliable and in need of frequent repair;

d)    Whether the N63TU engine and its variants were defectively designed and/or manufactured;

e)    Whether BMW knew or should have known the Class Vehicles were defective before they were first sold to consumers;

f)    Whether BMW misrepresented or omitted material information regarding the quality and/or reliability of the Class Vehicles;

g)    Whether the Class Vehicles have conformed to reasonable buyers' expectations;

h)    Whether BMW had a duty to inform purchasers of the Class Vehicles about the Oil Consumption Defect prior to sale;

i)    Whether as a result of Defendants' concealment or failure to disclose material facts, Plaintiff and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Defendants;

j)    Whether Defendants breached the New Vehicle Limited Warranty; and

k)    Whether Defendants breached the promises set forth in the BMW Maintenance Program.

94.    **Typicality.**  Plaintiff's claims are typical of the claims of the other Class members in that Plaintiff sustained damages arising out of the same illegal actions and conduct by Defendants.

95.    **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of Class members.  Plaintiff has retained counsel that is highly experienced in complex

consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Classes.

96.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

97.     In the alternative, the Class and Subclasses may also be certified because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants.  The prosecution of separate actions by individual Class members also would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Finally, Defendants have acted or refused to act on grounds generally applicable

to the Class and Subclasses whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Breach Of Express Warranty**

98.     Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

99.     Plaintiff brings this count on behalf of himself and members of the Class and Subclasses.

100.     BMW assembled and placed the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiff and Class Members.

101.     In the New Vehicle Limited Warranty, BMW expressly warranted the Class Vehicles "against defects in materials or workmanship" when first sold to retail purchasers.

102.     BMW also expressly warranted that it would repair or replace defective vehicles, at no cost to the owner, if it receives notice of vehicle defects within the first 48 months or 50,000 miles after the first retail sale.

103.     Pursuant to the BMW Maintenance Program, BMW also expressly warranted that it would "cover[] all factory-recommended maintenance, as determined by the Condition Based Service (CBS) system."

104.     The terms of BMW's New Vehicle Limited Warranty and the BMW Maintenance Program became part of the basis of the bargain between Plaintiff and all other Class Members when deciding to purchase a Class Vehicle.

105.     Plaintiff and Class Members, including second-hand owners who did not purchase Class Vehicles from BMW authorized dealerships, are express, intended third-party

beneficiaries of BMW's New Vehicle Limited Warranty because it explicitly extends to "the first retail purchaser, and each subsequent purchaser."

106.     BMW breached its New Vehicle Limited Warranty with respect to the Class Vehicles: (1) each time it sold Class Vehicles in a defective state to first retail purchasers; (2) each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning Class Vehicles to a non-defective state; and (3) each time it failed to authorize its service representatives to perform adequate repairs on Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Limited Warranty.

107.     BMW breach its BMW Maintenance Program by refusing to cover the cost of the additional quarts of engine oil required by the Class Vehicles' CBS systems to be added in between oil changes.

108.     As a result of the Oil Consumption Defect, the Class Vehicles were defective and did not adhere to the New Vehicle Limited Warranty when first sold and have not been remedied as originally warranted since the time of sale.

109.     By breaching its express warranty, BMW has caused and continues to cause these warranties to fail of their essential purpose.

110.     Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

111.     The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and the Class Members.  Among other

things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

112.    BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Limited Warranty and/or Plaintiff and Class Members were not required to do so because such an opportunity would be futile.  BMW has known about the Oil Consumption Defect since at least 2008 and failed to repair or replace Class Vehicles as originally warranted.

113.    As a direct and proximate result of BMW's breach of the New Vehicle Limited Warranty and the BMW Maintenance Program, Plaintiff and Class Members have suffered damages in an amount to be determined at trial.

114.    Plaintiff, individually and on behalf of the Class and Subclasses, seeks all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred as a result of the Class Vehicles breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory damages, attorney's fees, and all other relief allowed by law.

## COUNT II
### Breach Of Implied Warranty

115.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

116.    Plaintiff brings this count on behalf of himself and members of the Class and

Subclasses.

117.    BMW marketed and placed the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiff and Class Members.

118.    BMW is a "merchant" for purposes of the Uniform Commercial Code because the company regularly sells consumer automobiles of this kind.

119.    As a result of the Oil Consumption Defect, the Class Vehicles were defective and not of merchantable quality when they left BMW's control.  Plaintiff and Class Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiff's and Class Members' ordinary and expected use of their vehicles, BMWs containing any variant of the N63TU engine did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the luxury consumer automotive industry at the time of sale.

120.    As recognized in the New Vehicle Limited Warranty, BMW also extended an implied warranty of merchantability over class vehicles for 48 months or 50,000 miles.  BMW breached this warranty of future performance with respect to the Class Vehicles: (1) each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning the Class Vehicles to a minimally passable state; and (2) each time it failed to authorize its service representatives to perform adequate repairs on the Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to the underlying defects mask defects until the expiration of the implied warranty of merchantability.

121.    BMW has been given a reasonable opportunity to cure its breach of the implied warranty of merchantability and/or Plaintiff and Class Members were not required to do so

41

because such an opportunity would be futile.  BMW has known about the Oil Consumption

Defect since at least 2008 and has failed to repair or replace the Class Vehicles to a minimum

standard of quality.

122.     Defendants' attempt to disclaim or limit the implied warranty of

merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically,

Defendants' warranty limitation is unenforceable because they knowingly sold a defective

product without informing consumers about the defect.

**COUNT III**
**Unjust Enrichment**

123.     Plaintiff incorporates by reference all allegations contained in this Complaint as

though fully set forth herein.

124.     Plaintiff brings this count on behalf of himself and members of the Class and

Subclasses.

125.     This claim is pled in the alternative to the other legal claims alleged in the

complaint.

126.     Plaintiff and members of the Classes conferred a benefit on Defendants by

leasing or purchasing the Class Vehicles.  Defendants were and should have been reasonably

expected to provide Class Vehicles free from the Oil Consumption Defect.

127.     Defendants unjustly profited from the lease and sale of the Class Vehicles at

inflated prices as a result of their false representations, omissions and concealment of the Oil

Consumption Defect in the Class Vehicles.  Defendants benefited, at Plaintiff's and class

members' expense, when they sold or leased vehicles that were inferior to the vehicles Plaintiff

and class members thought they were purchasing, yet the price they paid was the price for a

supposedly better functioning vehicle they thought they were purchasing.  Defendants also

42

unjustly profited from refusing to cover the costs of additional engine oil under the BMW Maintenance Program.

128.    As a proximate result of Defendants' false representations, omissions and concealment of the Oil Consumption Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Classes.  It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiff and members of the Classes.

129.    There is a direct relationship between Defendants on the one hand, and Plaintiff and class members on the other, sufficient to support a claim for unjust enrichment. Defendants, acting in concert, failed to disclose the Oil Consumption Defect to improve retail sales, which in turn improved wholesale sales.  Conversely, Defendants knew that disclosure of the Oil Consumption Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of Defendants' brand among Plaintiff and class members.  Defendants also knew their concealment and suppression of the Oil Consumption Defect would discourage Plaintiff and Class members from seeking replacement or repair of the engines, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

130.    Plaintiff and members of the Classes are entitled to restitution in the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

131.    Plaintiff and members of the Classes seek an order requiring Defendants to disgorge their gains and profits to Plaintiff and members of the Classes, together with interest,

in a manner to be determined by the Court.

## COUNT IV
## Fraud By Omission

132.     Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

133.     Plaintiff brings this count on behalf of himself and members of the Class and Subclasses.

134.     Defendants intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the engines installed in the Class Vehicles suffered from the Oil Consumption Defect, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff and Class members rely on Defendants' misrepresentations and omissions.  As a direct result of Defendants' fraudulent conduct, Plaintiff and Class members have suffered actual damages.

135.     Plaintiff and Class members would not have purchased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and the existence of the Oil Consumption Defect or would have paid less for the Class Vehicles.

136.     Defendants had a duty to disclose the Oil Consumption Defect because it can cause engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Class Vehicle drivers, their passengers, and others who share the road with them to serious risk of accidents and injury.

137.     Defendants also had a duty to disclose the Oil Consumption Defect as a result of partial representations made in the owner's manual and the New Vehicle Limited Warranty. The owner's manual describes the "BMW Maintenance Program," which "covers all factory-

recommended maintenance."  However, that Program excludes from coverage "'topping off'
low fluids (e.g., engine oil …)" and "[o]il changes performed outside the recommended
maintenance intervals …."  Those partial representations do not disclose the Oil Consumption
Defect and thus create a reasonable belief that the amount of oil that the Class Vehicles
consume is comparable to other vehicles.  The owner's manual also contains a "maintenance
service summary" that specifically addresses replacing engine oil.  The summary identifies
recommended replacement oil and various air and fuel filters that should be replaced after every
second, fourth, and fifth engine oil service.  The manual does not disclose that the maintenance
instructions may be impacted by the Oil Consumption Defect.

138.    Plaintiff and Class members relied upon material omissions of employees and
agents of Defendants at the time of purchase or lease, and material omissions in the owner's
manuals, concerning the Oil Consumption Defect.

139.    Defendants knew their concealment and suppression of material facts were
false and misleading and knew the effect of concealing those material facts.  Defendants knew
their concealment and suppression of the Oil Consumption Defect would sell more Class
Vehicles and would discourage Plaintiff and Class members from seeking replacement or repair
of the engines, thereby increasing profits.

140.    Defendants acted with malice, oppression and fraud.

141.    Plaintiff and Class members reasonably relied upon Defendants' knowing,
affirmative and active concealment and omissions.  As a direct and proximate result of
Defendants' omissions and active concealment of material facts regarding the Oil Consumption
Defect, Plaintiff and Class members suffered actual damages in an amount to be determined at
trial.

## COUNT V
### Violation Of The Magnuson-Moss Warranty Act ("MMWA")

142.     Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

143.     Plaintiff brings this count on behalf of himself and members of the Class and Subclasses.

144.     Plaintiff and other Class Members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Class Vehicles for personal, family, or household purposes and are entitled to invoke the New Vehicle Limited Warranty.

145.     BMW is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells BMW vehicles accompanied by the written New Vehicle Warranties.

146.     The amount in controversy of the Plaintiff's individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

147.     BMW violated the Magnuson-Moss Warranty Act when it failed to honor its written warranty obligations in the New Vehicle Limited Warranty by delivering Class Vehicles that suffered from the Oil Consumption Defect as described in detail above.

148.     BMW specifically warranted its vehicles "against defects in materials or workmanship" at the time of retail sale and for an additional "48 months or 50,000 miles." BMW extended this warranty "to the first retail purchaser, and each subsequent purchaser" for the duration of the warranty.

149.     The terms of BMW's written New Vehicle Limited Warranty became part of the basis of the bargain between Plaintiff and all other Class Members when deciding to purchase a Class Vehicle.

150.     BMW breached its written warranty with respect to Class Vehicles: (1) each time it sold Class Vehicles in a defective state to first retail purchasers; (2) each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning Class Vehicles to a non-defective state; and (3) each time it failed to authorize its service representatives to perform adequate repairs on Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Limited Warranty.

151.     BMW also extended an implied warranty of merchantability on Class Vehicles at the time of sale and for the first 48 months or 50,000 miles.

152.     BMW breached the implied warranty of merchantability when it sold Class Vehicles to consumers that suffered from the Oil Consumption Defect when they left BMW's control.  Plaintiff and Class Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiff's and Class Members' ordinary and expected use of their vehicles, the Class Vehicles have not lived up to minimal consumer expectations.  As a result, BMW breached the implied warranty of merchantability when it sold Class Vehicles that were not of fair average quality and would not pass without objection in the luxury consumer automotive industry at the time of sale.

153.     BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Limited Warranty and implied warranty of merchantability and/or Plaintiff and Class

Members were not required to do so because such an opportunity would be futile.  BMW has known about the Oil Consumption Defect since at least 2008 and has failed to repair or replace Class Vehicles as originally warranted.

154.    As a direct and proximate result of BMW's breach of the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiff and Class Members have suffered damages in an amount to be determined at trial.

155.    Plaintiff, individually and on behalf of the Class and Subclasses, seeks all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred as a result of Class Vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages, all equitable remedies available pursuant to 15 U.S.C. § 2310(d)(1), statutory attorney fees pursuant to 15 U.S.C. § 2310(d)(2), as well as all other relief allowed by law.

## COUNT VI
### Violation Of The New Jersey Consumer Fraud Act ("NJCFA")

156.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

157.    Plaintiff brings this count on behalf of himself and members of the Class, the Multi-State Consumer Fraud Class, and the Subclasses.

158.    Plaintiff and Class Members have suffered an injury in fact and lost money or property as a result of Defendants' violations of New Jersey's Consumer Fraud Act ("NJCFA").

159.    The NJCFA protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing,

concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ."  N.J. Stat. Ann. § 56:8-2.

160.    Plaintiff and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

161.    Defendants engaged in unlawful conduct by deliberately and knowingly engaging in misrepresentations and false statements regarding the Class Vehicles, in the course of Defendants' business.  Specifically, Defendants knew or should have known that the Class Vehicles suffered from an excessive Oil Consumption Defect that required supplemental addition of oil in quantities as high as one quart every 750 miles.  However, Defendants failed to disclose this defect to Plaintiff and the class members at the time of purchase and/or lease.

162.    Defendants have also engaged in unlawful conduct by willfully and knowingly suppressing and/or omitting information related to the Class Vehicles to consumers. Specifically, Defendants purposefully and knowingly failed to disclose the Oil Consumption Defect in the Class Vehicles to consumers such as Plaintiff and the Class Members to secure the sale and/or lease of the Class Vehicles at a premium price.  Defendants also failed to disclose the Oil Consumption Defect during the limited warranty period to avoid having to perform their contractual duties under the warranty to repair all known defects.

163.    Defendants did not fully and truthfully disclose to their customers the true nature of the Oil Consumption Defect in the Class Vehicles, now was this defects readily discoverable at the time of purchase or lease.

164.    Defendants intended that Plaintiff and the Class Members rely on their misrepresentation and/or acts of concealment and omission, so that they would purchase and/or lease the Class Vehicles.

165.    Accordingly, Defendants have engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Defendants' acts and practices described herein offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Defendants fraudulently concealed the defective nature of the Class Vehicles from consumers.

166.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

167.    By engaging in the above-described practice and the actions and omissions herein alleged, Defendants have committed one or more unlawful acts in violation of the NJCFA.

<u>**COUNT VII**</u>
**Violation Of State Consumer Fraud Acts**

168.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

169.    The Consumer Fraud Acts of the states in the Multi-State Consumer Fraud Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.[22]

---

[22] California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*);

170.     Defendants intended that Plaintiff and each of the other members of the Multi-State Consumer Fraud Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

171.     As a result of the Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Multi-State Consumer Fraud Class have sustained damages in an amount to be proven at trial.

172.     In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT VIII

### Breach Of Implied Covenant Of Good Faith And Fair Dealing

173.     Plaintiff incorporates and reallege each preceding paragraph as though fully set forth herein.

174.     Each contract of sale and lease agreement entered by Plaintiff and class members for the purchase or lease of the Class Vehicles contains an implied term requiring BMW to adhere to a duty of good faith and fair dealing.

175.     BMW breached its duty of good faith and fair dealing by failing to notify Plaintiff and class members of the Oil Consumption Defect, and failing to fully and properly repair the defect, at no expense to Plaintiff and class members.  BMW further breached its duty of good faith and fair dealing by failing to honor the terms of the BMW Maintenance Program.

176.     BMW's breach of its implied duty of good faith and affair dealing is intentional, malicious, and with willful and wanton disregard of the rights and interests of Plaintiffs and class members.

---

Missouri (Mo. Rev. Stat. §407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

Case 2:19-cv-12680-ES-MAH   Document 1   Filed 05/17/19   Page 52 of 53 PageID: 52

177.     As a direct and proximate result of BMW's breach of implied duty of good faith and fair dealing, Plaintiff and class members suffered damages, including but not limited to oil costs, costly repairs, loss of use of the vehicle, loss in value and resale value of the vehicle and other damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class and Subclasses, and award the following relief:

A.     An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as a representative of the Class and Subclasses, and Plaintiff's counsel as counsel for the Class and Subclasses;

B.     An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

C.     Injunctive and equitable relief in the form of a comprehensive program to repair the Oil Consumption Defect, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class and Subclass members for all costs and economic losses;

D.     A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

E.     An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory

damages for economic loss and out-of-pocket costs in an amount to be

determined at trial;

F.      An order awarding any applicable statutory and civil penalties;

G.      A declaration that Defendants are required to engage in corrective advertising;

H.      An order requiring Defendants to pay both pre- and post-judgment interest on

any amounts awarded;

I.      An award of costs, expenses and attorneys' fees as permitted by law; and

J.      Such other or further relief as the Court may deem appropriate, just, and

equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of

any and all issues in this action so triable of right.

Dated: May 17, 2019                          Respectfully submitted,

                                             **BURSOR & FISHER, P.A.**

                                             By:_____*s/ Frederick J. Klorczyk III*_____
                                                      Frederick J. Klorczyk III

                                             Frederick J. Klorczyk III
                                             Joel D. Smith (*pro hac vice application to be filed*)
                                             1990 North California Blvd., Suite 940
                                             Walnut Creek, CA  94596
                                             Telephone: (925) 300-4455
                                             Facsimile: (925) 407-2700
                                             Email:  fklorczyk@bursor.com
                                                     jsmith@bursor.com

                                             *Attorneys for Plaintiff*